Good morning, your honors. May it please the court, Tom Schlesinger for Jose Espinoza. Hopefully they asked to reserve maybe a minute or two at the end. Okay, the clock counts down. Juries always look to the district court for clues on how the bench is interpreting evidence. Typically they look to the judge's reactions, either in the form of silent cues or other comments. But in this particular case, there was something a little bit more dramatic. And that was the comment from the bench in response to some cross-examination where there was an objection on relevancy grounds that the testimony of the FBI agents in the case was really uncontroverted and was so credible that it couldn't be challenged. And there was no prompt intervention on the part of the court once there was an objection and then a motion that followed for mistrial. And I suppose that one would want to distinguish between the cases cited by both parties as to whether this is a plain error or a harmless error case. This is a harmless error case because of the objection that was made. And then to decide whether or not the issues were contested and whether the evidence in this case was simply overwhelming and therefore we can somehow forgive what was said from the bench. Now, I'm not sure I know the answer to this, and you may be able to help me. There may not be a clean answer. I'm with you that there was an objection, so we're not talking plain error. What's the degree of prejudice? Is this structural error? Is this harmless error in the sense of we have to show something? I mean, what are we dealing with once we find that the judge shouldn't have done this, if that's what we find? There's two ways to approach it. One would be to say that the error was not harmless beyond a reasonable doubt because of the timely objection. There was also a briefing that we submitted that it was structural error because it simply took away from the jury's responsibility in determining credibility and in finding the elements of the offenses. And in this particular case, there was one count of conviction where it was wholly dependent on the testimony of the FBI and the state agents. And then the remaining counts, you had an informant who was working with the local law enforcement officers and then with the FBI in count three when he introduced an officer to the defendant, where very early on, before the case actually began, there was a possibility that the government wasn't even going to call the informant, that they felt that they had enough evidence just on the basis of their law enforcement or professional witness testimony in order to carry the day. Because of the nature of the court's comments, it appears to me that the judge was directing a verdict on all of the counts of conviction. So you say this infected all of the accounts, not just the one? It did infect all of the accounts because the only evidence that was left as to the first three counts was the involvement of the informant. And as the court may recall, these were a series of controlled purchases that were conducted by the informant at the behest of the local agents and under the, I guess, in the background, the supervision of the FBI. And yet the testimony that the FBI and the local agents gave concerning the bona fides of its agent and the informant was that this person did everything that they were supposed to do, that they were searched before the controlled buys were made. There was no contemporaneous audio or video recording of the controlled buys, is that right? There was some audio recordings of these transactions, but it did not appear in the evidence that there was sufficient evidence beyond a reasonable doubt on the basis of those recordings to carry the day as to those. When there was the introduction of the agent in count three and the third controlled buy, I don't recall whether the agent was wearing a wire or not, but of course you had the testimony of the agent, which goes back to the very question that we've raised as to whether or not the court's comment infected the whole trial. So if you look at it as structural error or if you look at it as harmless error, it doesn't matter because the end result should be the same in this case, particularly since the issues were contested, first concerning the credibility of the informant as to the first three counts and then as to the final count, what happened during the raid when there was the forced entry into the apartment, which was obviously rather loud at 6 o'clock in the morning. This was a highly congested area, this apartment complex. There were a lot of people in that area. The defense was trying to obtain evidence through the testimony of the local agent that this was a high crime area and then that was somewhat corroborated by. At the time that the trial judge made the comment that he did, what are we to do with this evidence? Had the FBI agents testified at that point? The two FBI agents that appear to be at issue at the time, the court made his comments, were Special Agent Farris and Special Agent Winchester, both of whom had already testified. They had already testified. And the comment that the judge made then referred to the testimony that was already before the jury and in the record. That's correct. And the only reason why it came up in the context of the testimony of Detective Walker was because he was the local agent from Oxnard who would know, either from his own indices or his own personal experience, that this was a high crime area. And was the testimony of the FBI agents, and I'm asking these specific questions because I have not done a full record review, was the testimony of the FBI agents that they had seen the particular bag or bags that were thrown from the window and those had been tied back to the evidence of possession of the drugs? Yes, but in addition to that was this very detailed testimony from both agents concerning So that that excluded the coffee theory? Well, they didn't recall coffee grounds on the evidence, but they were talking about the fact that my client's whole torso was outside of this bathroom window that had open dimensions of 15 inches by 22 inches. And that, when you think about it, this guy That goes to his credibility, but I mean, I'm just trying to find out for my analytical purposes whether the testimony that the judge obviously improperly commented upon, nonetheless, was evidence that was in the record. Yes, that's correct. The evidence was already in the record concerning not only the throwing of the contraband allegedly from that window, but the fact that The contraband itself contained the drugs at issue. Well, it contained at that point because it hadn't been tested, something that was suspected to be illegal narcotics. Was there any testimony that later tied that up or evidence that tied the contents as being drugs? Well, yeah, there was drug testing of the evidence because it was seized. But one of the agents had said that it fell in a grassy area. Of course, this was not a grassy area. Then you've got the testimony concerning the fact that half of the defendant's body was hanging out the window, which was just physically impossible. He was 5 feet 10, 155 pounds. Was the evidence that your client did not throw the bag out of the window? Well, the evidence is that, well, what was attempted because the cross-examination High crime area. High crime area. What else? The fact that there was the knock notice was not responded to, and then there was a forced entry that was allowed entry. There was also an attempt to call a disinterested third-party witness named Alvarado on this particular issue as to whether the defendant was seen where the agents said he was seen and where they were positioned. An attempt to call that was thwarted? Well, she was able to testify on other areas of inquiry, but not in that particular area. She was shut down by the court. I suppose an offer of proof was made as to what she would testify. What would that have been? Well, concerning the fact that it was physically impossible to get an adult's torso through the bathroom window. She was not prepared to testify. I was watching the window, and I didn't see anybody throw anything out. No, she didn't recall seeing anybody hanging out the window when she came out of her apartment, when she was walking her dog. I see I've got four seconds left, if possible. I would also, just in conclusion, since there are a lot of issues that I obviously didn't touch upon, is that the closing argument on the part of the government sort of ties back to what the court said without limiting instruction, without cautionary instruction about we all know. We all know. We all know because the court said. Is that what the argument was? We all know because the court said? No, it wasn't that, but it wasn't a marshalling of evidence either, which is what their argument is. The we all know was that we all know that this defendant threw the baggie through the window. I thought it was we all know what the testimony is or was. No, it was we all know that this defendant threw the contraband out the window. And that was what Judge Wright had said was uncontrovertible because two FBI witnesses had already testified to that effect. And that's the problem because now you're bringing the courts, the imprimatur of the court into your own closing argument at the close of the case. And then, again, no cautionary instruction in the presence of an immediate objection at the first opportunity on the part of defense counsel. Why don't we hear from the government and we will give you a chance to respond. Thank you. Good morning, Your Honor. May it please the Court. Robin Bacon on behalf of the United States. I'd like to start, actually, by just clarifying the record with regard to the exact statement that I made during the closing argument. I can see you're looking for it, and I actually have the quote in front of me. And the sentence itself was quite long, but the pertinent part of it is we have photographs and witnesses. I'm sorry. Yes. We have photographs and witnesses who tell consistent stories that back up the one thing that we all know, which is that you have heard witnesses say that the defendant sold drugs and threw drugs out of his window, a bag of drugs that had coffee grounds on it. So that's my recollection of what you said. Turning to your questions regarding the record and the judicial bias issue, I think, first of all, it's worth keeping in mind that the issue here is not simply whether or not the judge's question was improper, but more whether that single question that came up in the context of a relevancy objection during the cross-examination of one of the witnesses, to use the language of the Scott case from this Court, projected to the jury an appearance of advocacy or partiality and had a sufficiently prejudicial effect on the proceedings as to require this Court to set aside the jury's verdict of guilty on all four counts. And the important thing is that this question be answered in light of the context of the case as a whole. Did you oppose a curative instruction? I did not oppose a curative instruction. Did you support a curative instruction? Had defense counsel proposed one, I would have considered it. Under the circumstances, the defense never actually asked for a curative instruction. He asked for a mistrial. Did you see this as trouble when the Court said it? My ears perked up, but I did. I would think so. But I did not, because there was no curative instruction proposed and I didn't take a position when defense counsel asked for a mistrial. Let me get the context here. You're saying that this came up in the context of an objection as to relevancy. Yes, Your Honor. And I will paint the picture for you, and this is all in the record, both in the excerpts from the defense and from the government. The first two witnesses called were Special Agents Ferris and Winchester, and they both testified they were on the SWAT team, they were behind the apartment building, and they had seen defendant trying to climb out of a bathroom window, but before they saw him do that, they saw a hand throw a white plastic bag through the window and that bag landed in front of them. The third witness was Detective David Walker from the Oxnard Police Department, and he was one of the local law enforcement who participated in the search. He testified about finding coffee grounds in the apartment, the large overturned coffee can, the trail of grounds leading to the back window. He also testified that he had collected the plastic bag, and he testified at length about the fact that there were coffee grounds on the bag. And the jury heard all of this during his direct. They saw photographs of the bag with the coffee grounds, photographs of the coffee can, all of this. During cross-examination, there were extensive questions about the coffee grounds. At one point, defense counsel asked if this was a high-crime area. In response, I objected on relevance grounds. And the court sustained your objection. And the court sustained my objection, and defense offered to proffer a theory. May I make a proffer, Your Honor, quickly? Yes. In that context, defense explained his theory of the case, and this echoed some of the things that he had said during his opening statement. One of his theories of the case, his theory of this particular charge, which was that this was a high-crime area and there may be other sources for the drugs that were found outside. Your answer is as to why this package may have been there. Yes, Your Honor. And that's when the court says, do we discount the testimony of two FBI agents who saw it come from the window? Yes. And defense counsel answered the court's question with yes, we are impeaching that. And the court then made a comment about Wall Street being a high-crime area and told him to proceed. So the question was, do we discount that testimony? And the defendant says yes. So it's really in the context of argument that this statement is made. Yes, Your Honor. The court asked a question. Do we discount this? And defense counsel answered, yes, we do. And then the court allowed him to proceed. And I think it's telling that the court allowed him to proceed not with that line of questioning with that particular witness. Well, he cut off the court cut off that line of questioning. With that particular witness. But defense called. All right. Let's move on. Wall Street's a high-crime area, too. So let's move on. So that objection remains sustained. It did remain sustained, but only with that witness, Your Honor. In fact, the defense called his own investigator as part of his case who testified that it was a high-crime area and was able to offer testimony about that and about the rates of crime. But the fight is not really about whether or not it was proper to exclude their testimony about high crime as an abuse of discretion. The fight is about what he said. Do we discount testimony to FBI special agents who saw it come from the window? He doesn't say, as you said in your closing argument, who said they saw it come from the window. That's true. And if you if the question here today is whether that was a well-phrased question, I don't disagree at all. It's a catastrophically bad question. I think. We know what the court meant, too, because later on outside the presence of the jury, the court interrupted and said, all right, stop right there. This is just wrong. The subject under discussion was the bag. The fact that the two officers saw the baggie being thrown from the window. That's also true, Your Honor. The courts adopted that as a fact. But importantly, the court had that conversation with defense counsel outside of the presence of the jury. I know, but it sheds light on what the court meant when it said we saw the FBI agent say they saw it from the window. It's not a slip of the tongue by the judge. And I would never suggest that I know what was going through the court's mind at the time or that I was happy when he phrased the question that way at trial. But the question for this Court is whether that one comment, because this is the only thing that took place in the presence of the jury, so prejudiced the proceedings as to make it impossible to have confidence in the jury's verdict of guilty. It didn't, Your Honor, for a number of reasons. And one is that it was just a single question that came up not during the testimony of these two witnesses, but in fact in resolving a relevance issue for a different witness. It was not a situation in which this was just a he said, he said about the presence of the bag. There are, in fact, multiple witnesses and physical circumstantial evidence to support the government's theory of the case. This was not a credibility contest. In fact, the jury also had their own opportunity to see the picture of the bag of the drugs with the coffee grounds, to see the pictures of the coffee grounds. In fact, entered into evidence, and this is in the record, was the can of coffee grounds itself. So this came up in that context as opposed to a situation where we were simply relying on the word of one witness. What was the evidence in your view that the bag had not been thrown out the window by the defendant? The defense offered testimony from a neighbor who did testify that she had been walking her dog that morning and had not seen a bag of drugs or any Federal agents behind the apartment. Her testimony was. It sounded to me like she wasn't there at the time all this happened. Well, she claimed that she was, but in fact, the government introduced video evidence to suggest that she was not. And we actually, in our rebuttal case, introduced video footage that showed that she hadn't left her apartment that morning. He also introduced testimony from his investigator that it was a high-crime area and cross-examined government witnesses at length regarding their credibility, opportunities to see whether or not what they saw matched up to the evidence. I mean, the defense had an opportunity to present a case. My recollection is that there was some testimony that, at least at some time, at some point, that baggie with the drugs in it did not have coffee grounds. Could you review that evidence for me? Well, Your Honor, the two special agents, the two FBI special agents who saw the bags did not have any testimony to offer regarding the presence of coffee grounds. And there was extensive cross-examination of Detective Walker about whether or not there were, in fact, coffee grounds on the bag, and also whether or not he had taken into evidence any coffee that was recovered from inside the apartment. And it was actually in the context of that back and forth that Detective Walker introduced a photograph, his own copy of the photograph of the drug bag, and also testified that you could, in fact, smell the coffee grounds coming from the bag. So that was an issue that was addressed earlier in Detective Walker's testimony before defense moved to the issue of whether or not this was a high-crime area. I don't recall any other witnesses being asked about the coffee ground issue, but Detective Walker was really the main witness with respect to that. I would add also that there was another FBI agent witness. It's true that this case was primarily law enforcement witnesses, but the evidence were recordings and photographs and physical evidence as well as testimony. And it's not particularly unusual in a criminal case to have a large number of law enforcement witnesses. What kind of recordings were there that would corroborate the idea that there were drugs involved in all of this in the informant's testimony? The informant was wearing a recording device during all three of the controlled buys, as well as the undercover officer was also wearing a recording device. And there were recorded phone calls between the informant and the defendant. And these were all played for the jury primarily during the testimony of Special Agent Mike Easter, which didn't come up very much in the context of this brief. But the jury had an opportunity to hear calls between the defendant and the informant, as well as to hear what transpired every time the defendant met with the informant and every time that there were drug deals. So the recordings themselves as well as the testimony. How incriminating were the recordings themselves? They weren't video recorded. There was never any explicit mention of methamphetamine, but you could hear the defendant counting money in each of the recordings. There were extensive discussions of pants and pants being super clean and I'd like two pants. And in the meeting with the undercover, there was talk of a new box coming in and other coded language. Was there expert testimony that decoded the coded language? There was testimony from Special Agent Easter regarding the nature of the coded language and regarding the use of coded language in these kinds of contexts. And Detective Walker also testified regarding the quantities of methamphetamine commonly used for sale versus methamphetamine quantities for individuals. Not about much. I had a case years ago where they were using coded language and one of the people in the discussion forgot the code. So he started whispering, I don't remember what shirts mean. Shirts mean cocaine. It was that silly. There is nothing that explicit here, but there were quite a few instances in which the conversation, quite frankly, didn't make a lot of sense in the absence of coded language. And that was presented to the jury. I mean, they had an opportunity to consider that. So if there are no further questions, I see that I'm out of time. I thank the Court. Thank you. We took you over time or maybe you took us over time. Would you like a minute to respond? Just briefly, Your Honor. Thank you. A couple of things, different points, different odds and ends here. First of all, just about the informant himself. Recall that the evidence is that the informant is going in by himself to do these transactions and that he's got a very bad drug problem and he's not terribly reliable. And his examination, his testimony is implausible in many points. That without the law enforcement to back him up all the way as to those first three counts, there really wouldn't be a very strong case to rely on if one were to rely upon this particular informant. He was just not one of the stronger witnesses. So what was your theory as to what was going on during these transactions? Well, I mean, this informant basically was paid for his participation and he did a number of defendants. I mean, there were numerous people that were brought to justice as a result of his efforts. Brought to injustice? Well, depending on how you look at it. And the problem is- My question is what was going on in these transactions where there was funny language being used and money being counted? Nothing. These were just all prefatory conversations that preceded the actual meetings that took place where the informant was by himself. And so, again, because of his past drug addiction for this particular drug and other drugs made him pretty unreliable and made the dependency of the case on the law enforcement side to be that much more important. I think Judge Fletcher mentioned at the beginning whether this should be a structural case or a harmless case. And I think that the Supreme Court case of Sullivan would suggest that this should be a structural analysis because what happened here was that the jury was really taken out of their fact-finding mission by the statement that was made by the district court that the testimony of the FBI agents was really unassailable. And, therefore, you don't have to worry about that part of the case. There's another Ninth Circuit case right on point that talked about this. That was the Harding case that came down in the mid-'60s where the court had said that the testimony of the Secret Service agent in that particular case had not been impeached. And, therefore, the jury could hold true whatever that particular witness testified to. I'm having trouble reading Harding as giving me structural error. It looks as though that language is telling us that it had such an obvious effect. Okay. You get to the same end result regardless of which way you approach it. Okay. Now, as far as this business. Now, we gave you a minute. We're up to three minutes. Why don't you take 30 seconds to sum up? Thank you. Coffee grounds are found in excerpts of Record 57. You can take a look at them. There's no evidence of coffee grounds on this particular item of evidence. Was there no picture with coffee grounds on the baggie? There was a photograph taken that was presented to the jury as an exhibit at ER 57. Yes. If you look at it, it does not appear to have coffee grounds on it. Now, that may be that during the processing and the sending of the evidence down to Vista, California, that they lost that. I'll finally end with the reminder that the defense counsel at the trial began with his opening argument, indicating that what happened at the apartment was going to be contested. And so it was not only contested during the trial, but also in the arguments that he gave. Thank you. Okay. Thank you. Thank both sides for their argument. Espinoza-Gonzalez versus – I'm sorry, United States versus Rodriguez-Espinoza, submitted for decision. The last case on the argument calendar this morning is Griffin versus Harrington. Just a little housekeeping before we get to that. One case has been submitted on the briefs, United States versus – I'm going to have trouble pronouncing it – Scherzoz. That has been submitted, and there's a case that's been removed from calendar because it's settled, Neumann versus Udall Medical Products. So the one remaining case, Griffin versus Harrington.
judges: Trott, Lucero, Fletcher